[Civ. No. 2646.   Third Appellate District.—February 21, 1924.]

In the Matter of the Estate of ELLEN M. WILSON, Deceased. E. PHOEBE DOOLITTLE et al., Appellants, v. THOMAS McCONNELL et al., Respondents.

[1] WILLS—DESIGNATION OF CLASS—LAW APPLICABLE—TIME—INTENT. Where the will of a testatrix, after devising a life estate in certain real property to her son with the remainder over at his death to his then living children, provides that if said son "leaves no issue, then upon his death, all such real property shall be distributed among my heirs, as provided by the laws of the state of California, the same as if I had died intestate," it is the intent of the testatrix to designate as the objects of her contingent bounty that class of persons who under the law as she knew

it to be at the time of the execution of her will were her heirs as provided by law in the event of intestacy and the failure of issue, and not that class who would be her heirs in the event of intestacy under the law as the law might be at the time of the vesting of the contingent remainder.

[2] ID.—PREFERENCE OF BLOOD KINDRED.—Considering the close family relation existing between the testatrix and her own blood kindred, if from her language her intent may be deemed to be doubtful there is "the well-settled rule that where the law is capable of two interpretations and one should be adopted it prefers those of the blood of the testatrix to strangers."

[3] ID. — BENEFICIARIES INTENDED — AMBIGUOUS LAW REFERENCE. — Where there is any doubt as to the identity of the beneficiary or class of beneficiaries, the intent of the testator should be interpreted in the light of the known conditions surrounding him and presumably influencing him at the time he executed the will; and where he has made an ambiguous reference to the law to designate his beneficiary it will be presumed, in the absence of differently expressed intent, that he referred to the law existing at the time of the expression of his intent.

APPEAL from an order of the Superior Court of Sacramento County directing distribution of an estate. Charles O. Busick, Judge. Reversed.

The facts are stated in the opinion of the court.

Grove L. Johnson, Butler & Van Dyke, Ben P. Tabor and George, Hinsdale & Pigott for Appellants.

White, Miller, Needham & Harber, Irving D. Gibson and Elliott & Atkinson for Respondents.

BUCK, J., *pro tem.*—This is an appeal from a decree of distribution involving the construction of a will and the ascertainment of the intention of the testatrix as expressed in her will regarding which of two classes of persons should be the beneficiary of a certain contingent remainder created by the will.

On behalf of the appellants who comprise nineteen nieces and nephews of the testatrix it is contended that it was the intent of the testatrix to designate as the objects of her con-

3. Extrinsic evidence to establish identity of legatee or devisee, notes, Ann. Cas. 1915B, 10; 47 L. R. A. (N. S.) 514.

tingent bounty that class of persons who under the law as she knew it to be at the time of the execution of her will were her heirs as provided by law in the event of intestacy and the failure of issue. While on behalf of the respondents who are the collateral relatives of her predeceased husband it is contended that it was the intent and purpose of the testatrix as disclosed by her will to have her property go to that class who would be her heirs in the event of intestacy under the law as the law might be at the time of the vesting of the contingent remainder.

By her will dated April 30, 1896, which was prepared by "an attorney of recognized standing and ability throughout the state of California," the testatrix provided as follows:

"All the real property of which I may die seized, and all in which I may at the time of my death have any interest, wheresoever situated, I give and devise unto my said son, to have and to hold the same for and during the term of his life; and at his death the same shall go and be the property of his then living children,—it being my intention to devise unto him a life estate in the whole of said realty, with remainder over at his death, to his then living children; and if he leaves no issue, then upon his death, all such real property shall be distributed among my heirs, as provided by the laws of the state of California, the same as if I had died intestate."

"If my said son shall die before me, leaving issue, then all of my property and estate, of every kind, shall go to such issue, to whom I hereby give, devise and bequeath the same; but if he shall die before me without issue, then I give, devise and bequeath the whole of my property, and estate, of whatsoever kind and wheresoever situated, unto my heirs—the same to be distributed among them according to the California laws of succession in cases of intestacy."

The son was designated as executor without bonds. The first codicil, dated February 14, 1898, which was not prepared by the attorney referred to, gave $4,000 and a diamond ring to her "beloved niece," Carrie Doolittle.

On June 2, 1899, she executed a second codicil which merely revoked the legacy of $4,000 to Carrie Doolittle, the amount of the same having been given her that day in money, and confirmed and ratified her previously executed will in other respects.

At the time of the execution of the will the deceased was a widow sixty years of age and had then living several brothers and sisters and numerous nieces and nephews. In 1861 she had married one Thaddeus McConnell, who died intestate in 1863, leaving property of the value of $24,661, all of which was his separate property and one-half of which was distributed to the testatrix and the other one-half to her infant son Thaddeus. At the time of her death the value of her estate was $94,822, a greater portion of which was found by the court to be the proceeds of the separate property of her deceased husband distributed to her from his estate. After the death of her husband, Thaddeus McConnell, the testatrix married one William T. Wilson, whom she subsequently divorced. At the time of her death in 1907 she left as her sole heir her son, Thaddeus McConnell. She also left surviving her a brother and numerous nieces and nephews. Subsequent to her death her brother and one of her nieces, Ellen Flanagan Purchase, died, leaving certain heirs at law. On April 10, 1919, her son, Thaddeus McConnell, died testate without living isssue and left as his sole heir at law and devisee his widow, Etta Mc-Connell. In 1896, at the time testatrix made her will, it was provided by law that the property of a person, irrespective of the source from which it may have been derived, should, in the event of intestacy, and the failure of issue, spouse, or parent, go upon his death to his brothers and sisters and the children of deceased brothers and sisters. Not only at the time the testatrix made her will, but from time to which the memory of man runneth not to the contrary, it had been in substance so provided by law. But in 1905, two years before her death and nine years after she made her will, the statute of succession of this state was amended to provide that upon the death of an intestate without spouse, or issue, that portion of his estate which had been the separate property of a predeceased spouse would go to the relatives of the predeceased spouse.

After the death of her son without issue in 1919, the appellants herein and the widow of the son Thaddeus each claimed to be entitled to the estate of the testatrix herein and opposing petitions for distribution were filed. And in the lower court the property was ordered to be distributed to the widow, but upon appeal to the supreme court by the

appellants herein this order was reversed (*Estate of Wilson,* 184 Cal. 63, 193 Pac. 581]).

The respondents herein filed no petition for distribution in the lower court and made no appearance in the supreme court until after the opinion of the court was filed. Then one of them applied to the supreme court for a modification of the language of the opinion "in order that he and others similarly related may not be prejudiced by anything stated in the opinion"; and the opinion was accordingly amended to read as follows: "If the heirs are to be determined as of the date of the termination of the life estate as we think is the proper construction of the will, in so far as the record before us shows such claimants constitute the whole of the heirs to whom such realty is given." By "claimants" the court referred to the appellants herein. All of the foregoing amendments and some other language of like import was a part of the original opinion except the words "in so far as the record before us shows." After the rendition of this decision in the supreme court the respondents petitioned the superior court for distribution of the estate to them, claiming that the estate left by the testatrix, being the proceeds of the separate property of her predeceased spouse who died in 1863, was by her will devised and bequeathed to them by virtue of the contingent remainder provided for in the will. And that it was her intention, as expressed in her will made in 1896, that the beneficiaries of the contingent remainder should be not the class indicated by the statute in effect in 1896, but should be the class to be indicated by whatever statute might be in effect upon the vesting of this contingent remainder.

Respondents and appellants herein each rely in their respective behalfs upon different language in the opinion rendered by the supreme court on the previous appeal as conclusive of the present controversy. But the only suggestion made in the opinion that the court had before it any facts indicating the origin or nature of Mrs. Wilson's estate appears from the following language in the opinion: "Mrs. Wilson's estate consisted entirely of the property derived from her first husband's estate and additional property acquired through her own subsequent investments." But it does not appear that the court at the time of the filing of this opinion had any knowledge from the record that Mrs.

Wilson's first husband had left any relatives or that such relatives were making any claim as against the appellants or anyone to any of the property in her estate "derived from her first husband's estate."

The court, however, in construing the will, did mention the following fact which was evidently a potent surrounding circumstance when she executed the will: "At the date of the execution of the will she had several brothers and sisters still living, and numerous nieces and nephews and the relations between her and her relatives were very friendly."

In this connection the court stated that "the question presented is, of course, as to the intention of the testatrix as disclosed by the language she has used in her will, taking into view, in case of any uncertainty arising upon the face of the will, the circumstances under which it was made, exclusive of her oral declarations." And in its conclusion the court used the following language upon the first portion of which the appellants herein especially rely and upon the latter portion of which the respondents rely. "Considering the will in its entirety, the scheme of the testatrix is perfectly clear to our minds. If her son died before her leaving issue, she desired such issue to have all her property, and if he died before her without issue surviving, she desired her own relatives to have all the property, to the utter exclusion of any person or persons taking solely under the son. If he survived her, she desired him to have all her personal property as his own, and a life estate only in her realty, with remainder to any of his children who survived him, but if, surviving her, he died without issue surviving him, she desired the real property to go to her next of kin, other than her son. The case is one where 'the context clearly indicates' (Civ. Code, sec. 1327) that the word 'heirs' was not used in the strict technical sense as designating the person or persons who would have succeeded under our succession statutes to the estate of deceased had she died intestate, but was intended to designate only those who would have been her heirs at law but for her son, either at the time of her death or at the termination of the life estate by the death of the son.

"Whether in view of the language of the will such heirs are to be determined as of the date of the death of the deceased or as of the date of the death of the life tenant

is a matter of no great moment to the respondent, who was not entitled to any of the real property in dispute in either event; but we think it clear that the intention was that they should be determined as of the date of the termination of the life estate.''

In the controversy which preceded the foregoing expression from the court there was no occasion for the court to consider the fact that the predeceased spouse of the testatrix had left any kindred. Nor does it appear that the court had any occasion to consider the fact that the statute relied upon by the respondent McConnell herein did not come into effect until nine years after the time of the making of the will. [1] Consequently, as between the litigants in this proceeding, it does not appear that any of the language used by the court in its opinion precludes a determination by this court of the question of construction presented herein, to wit, the question whether or not it was the intent of the testatrix when she created the contingent remainder herein to constitute as the beneficiaries thereof her own blood relatives whom the law, at the time she made the will, ''provided should be her heirs in the event of intestacy and the failure of issue.''

In the cases of *Estate of Watts,* 179 Cal. 20 [175 Pac. 415], *Estate of Page,* 181 Cal. 537 [185 Pac. 383], and *Estate of Simonton,* 183 Cal. 53 [190 Pac. 442], relied upon by respondents herein, it was held that when a testatrix used the words ''heirs'' or ''my heirs'' or ''my lawful heirs'' or heirs at law, as provided by the laws of succession of the state of California, ''she adopted for the purposes of her testamentary disposition the statute of succession'' (*Estate of Watts*), and that by such adoption she is presumed to have intended to make the blood relatives of her deceased spouse the objects of her bounty. But in each of the cases cited the statute adopted was, as a matter of fact, the statute in existence at the time the testatrix made her will and at the time she conceived and executed her intention to so adopt the statute. As already noted, the testatrix was a twice married widow of the age of sixty years, and had been a school-teacher in Vermont in her youth. Up to the time of the making of her will and for many years thereafter she was actively engaged in attending to the details of the management of a large business of

farming, stock-raising, buying and selling property and the
loaning of money on mortgages, and was a woman, as shown
by the evidence, of considerable business ability, self-reliant,
self-assertive, and always responsive to the human ties of
blood and family. In the drafting of her will she had the
advice and counsel of a competent attorney. But irrespec-
tive of such advice and irrespective of any mere fiction of
the law under which it is sometimes presumed for the pur-
poses of accomplishing justice that a person is familiar with
the law and the changes in the law, in this case it can be
conclusively, as a matter of common reason, presumed that
at the time testatrix made her will in 1896 she actually
knew and was influenced by the knowledge that her numerous
kindred with whom she was very friendly were the persons
who were her "heirs as provided by the laws of the state of
California the same as if I had died intestate."

And there is no evidence that at the time she made
her codicils, or at any time before her death, that she
was aware of any change in the statute, nor is there
any presumption of law or of common reason that she
would be aware or be made aware of such a change in the
statute. It would therefore seem that where there are
two statutes of succession invoked, one of which was
in existence and known to the testatrix at the time she
deliberately adopted the statute and the other of which did
not come into existence until nine years after her act of
adoption was performed, we should scrutinize the language
of the will for the purpose of seeing whether the testatrix
by the use of any language in her will expressed any intent
or purpose to adopt the unknown and nonexisting statute
and repudiate the known and presumably satisfactory one
for the purpose of designating the objects of her contingent
bounty.

When she used the words "as provided by the laws of
the state of California," if it was her intention to include
with the existing provisions of which she presumably ap-
proved future possible provisions as well, there was very
apt and convenient language by which she could so have
expressed herself by inserting after the word "as" the
words "may be," "will be" or "might be" or the word
"then," of which latter word she had just before made apt
and discriminating use when, in order to avoid any am-

biguity, she twice referred to "his then living children." The word "then" following the words "if he left no issue" and preceding the words "upon his death" was evidently used not in its chronological but in its sequential sense and clearly implies "in that event," etc. (*Brown* v. *Higgins*, 180 Wis. 253 [193 N. W. 84]; *Behrens* v. *Bauman*, 66 W. Va. 56 [27 L. R. A. (N. S.) 1092, 66 S. E. 5].)

Therefore, if the testatrix herself has not by any apt or convenient term stated that she intended to refer to any possible future statutory enactments to designate the objects of her bounty it would seem in reason that she meant by the use of the words "as provided by the laws" to refer to the laws already in existence.

Furthermore, by the same token that the court will prefer a vested estate to a contingent estate it should prefer a lesser degree of uncertainty to a greater degree of uncertainty and should, unless the language is clear to the contrary, accept as beneficiaries of a contingent estate those who are so designated by a lesser contingency. In the contingent remainder which she created there were already three contingencies,—first, the contingency of the death of the son; second, his death without issue, and third, the contingency that at the time of his death when the contingent estate vested there would be any one of the designated class alive. But, if the construction of the respondents is accepted, there would be in addition to those contingencies, the biennially recurring contingency of a change in the statute which would create a further contingency to determine the class that would be provided by law to be heirs in the event of intestacy; whereas, if the construction of appellants be accepted, the intent of the testatrix would be made more certain and would be responsive to the conditions and circumstances of her environment.

As stated in *In re Solms' Estate*, 253 Pa. St. 293, 296 [98 Atl. 596, at page 597], quoting *Anshutz et al.* v. *Miller*, 81 Pa. St. 212, 215: "Where an estate is given to a person described by relation either to the testator or to other devisees, on a contingency that may or may not happen, and a person is in being at the time of the execution of the will, to whom, on the happening of the contingency, the description would apply, it is a safe general rule to hold such person as intended to be the devisee."

See, also, *Quick* v. *Quick*, 21 N. J. Eq. 13, where the court distinctly held that in the event of failure on the part of the testatrix to indicate some future law for the purpose of ascertaining the objects of her bounty, such as the words "as the law *may* direct," and where she made use of the present tense by using the words "as the law directs," it will be presumed that she intended to control the division of the property among certain contingent heirs "not by the law as it might stand at the death of Ezekel but as it then stood." But in the case at bar the testatrix, by the use of the past tense, was certainly further from using the future tense than was the testatrix who used the present tense in the case of *Quick* v. *Quick*.

[2]  Furthermore, from the terms of the will and codicils and the close family relations existing between the testatrix and her own blood kindred, if from her language her intent may be deemed to be doubtful there is "the well-settled rule that where the law is capable of two interpretations and one should be adopted it prefers those of the blood of the testator to strangers." (*In re Edie,* 117 App. Div. 310 [102 N. Y. Supp. 424], citing *Wood* v. *Mitcham,* 92 N. Y. 375.)

[3]  The rule is well established that where there is any doubt as to the identity of the beneficiary or class of beneficiaries the intent of the testator should be interpreted in the light of the known conditions surrounding him and presumably influencing him at the time he executed the will. And where he has made an ambiguous reference to the law to designate his beneficiary it will be presumed, in the absence of differently expressed intent, that he referred to the law existing at the time of the expression of his intent. Schouler in his work on Wills has stated the rule as follows (2 Schouler on Wills, 6th ed., pars. 844 and 938, 939) : "On questions of construction a testator is presumed to speak as of the time of executing his will, but the date of the will must be considered in construing it, and the will speaks from its date on a question of identity of the beneficiary, and the conditions existing at the time of execution may be considered in construction. . . . In general, the intent of a testator must be gathered not merely from the language used in the will, but from that language in connection with the law of the land, whether of state or nation, and his

65 Cal. App.—44

personal environment including the state of the law at the time in view of statutes in force at the date of the will. . . . It is also presumed that the testator knew what disposition would be made of his property in case of intestacy and intended a different disposition by will and that a testator made his will with knowledge of the well-settled law of the state. The maxim that everyone is presumed to know the law, applies to existing but not to future enactments. In construing a testator's will as executed by him the court may ascribe to the testator, so far as his language permits it the common impulses of human nature."

Among the authorities relied upon to sustain the foregoing conclusions are the following cases: *In re Crozer's Estate,* 257 Pa. St. 241 [101 Atl. 801], where the court held that "a testator's legal intention is to be gathered from the state of the law at the date of the will, regardless of what it was at the time of his death."

Also the case of *In re Peterson's Estate,* 242 Pa. St. 330, 338 [89 Atl. 126, 128], where the court uses the following language at page 128: "The doctrine of the case just cited (*Neal's Appeal,* 104 Pa. 214) agrees with that which in general prevails, to the effect that the rule making a will to speak as though executed immediately before the death of the testator relates to the effect and operation of the instrument rather than to its construction, and, as regards the intention of the testator, the will is to be considered as of the date of the execution. Another way of stating the rule is that, where it appears in the will that the testator intended the will to be confined to the state of affairs existing when the will was made, the construction must be such as to conform to such intention."

Also, *Matter of Hoffman's Will,* 201 N. Y. 247, at page 255 [94 N. E. 990, 993], the court used the following language: "In considering the effect of the codicil, we do not look to what happened, when it became operative; we seek for what the testator intended by it when arranging the disposition of his residuary estate. . . . The intention of the testator in disposing of his residuary estate is to be ascertained not by what occurred long after the execution of his will, but by what was, apparently, or presumably, in his contemplation, at the time he was making it. A testator is presumed to speak as of the time of executing his will

and to base his calculations upon his dispositions taking
effect. (*McLean* v. *Freeman,* 70 N. Y. 81; *Morris* v. *Sickly,*
133 N. Y. 456 [31 N. E. 332].)'' In the case of *Morris* v.
*Sickly,* cited above (133 N. Y. 456 [31 N. E. 332]), the
court uses the following language: ''While a will is in some
sense ambulatory as to the objects and subjects with which
it deals yet it is not ambulatory as to the meaning of the
language used by the testator and the intention and pur-
pose which controlled the disposition of his property. That
intention and purpose must be found to exist at the time
of the execution of the will and cannot be varied or changed
by any future occurring events.'' And in the case of
*Houghton* v. *Hughes,* 108 Me. 233 [Ann. Cas. 1913A, 1287,
79 Atl. 909], the court, referring to the testator, stated:
''Levi W. Houghton lived and died in Maine. His will was
made and executed in Maine. It is not probable that he was
familiar with the laws of any other state, but he is presumed
to know the laws of Maine, and it should be assumed, we
think, that he used the words 'heirs at law' in his will in the
sense which those words then had according to the law of
the state of Maine, and as judicially construed by the courts
of Maine, there being nothing in the language used which
repels or controls such conclusion.'' In the foregoing case
the court quoted the following language of Mr. Justice Story
in the case of *Harrison* v. *Nixon,* 9 Pet. (U. S.) 483 [9 L. Ed.
201, see, also, Rose's U. S. Notes]: ''The language of wills
is not of universal interpretation, having the same precise
import in all countries and under all circumstances. They
are supposed to speak the sense of the testator according to
the received laws or usages of the country where he is
domiciled, by a sort of tacit reference, unless there is some-
thing in the language which repels or controls such con-
clusion.''

Also, in the case of *Webb* v. *Webb,* 111 Ark. 54 [163 S. W.
1167], the court uses the following language: ''As to the
effect and operation of the will, as a general rule, in the
absence of language showing a contrary intention, it speaks
from the death of the testator. But when the purpose is to
ascertain what the intention of the testator was from the
construction of the language used by him in the will, then
the will should be construed as of the date of its execution.
(See, also, 40 Cyc. 1424 B.)''

Also, in the case of *In re Swenson's Estate,* 55 Minn. 300 [56 N. W. 1115], the court held as follows: "The rule that a will speaks as of the date of the decease is not an unyielding one, especially when by a change of statute the words would have a different meaning if used in the will executed under the new law. . . . The testator would have no reason to suppose that his manifest intent could or would be affected by legislative enactment, and that if, when he executed the will, certain persons were clearly intended and sufficiently designated as the recipients of his bounty, future legislation could interfere with or control that intention and designation. The words 'heirs at law' found in the residuary clauses of the will, must be construed as of the date of its execution, and not with reference to the statute as it existed when the testator died. . . . Such words as heirs, or legal heirs, though their technical significance is not to be overlooked, may to give effect to the intent of the testator, be held to refer to others than those who are technically heirs, or to exclude those who are technically heirs." (See, also, *In re Anderson's Estate,* 148 Minn. 44 [180 N. W. 1019].)

And in the case of *Radford* v. *Fidelity etc. Co.,* 185 Ky. 453 [215 S. W. 285], the following language was used by the court: "It is contended by appellants that in ascertaining the intentions and meaning of the testatrix, as expressed in the instrument, and in construing it in order to determine the rights of the parties under the will, we must be guided by the laws upon those subjects which prevailed in the state of Indiana at the time of the execution of the will. This contention seems to be sound, as, in accordance with the general rule of interpreting and ascertaining the meaning and intentions of a testator as expressed in his will, reference must be had to the law of his domicile at the time the will was executed, and such law will govern, unless it appears from the will that the testator had in mind and made his will with reference to the law prevailing in some other country or jurisdiction." (See, also, *Williamson* v. *Williamson,* 58 N. C. 142–145; *Lavender* v. *Rosenheim,* 110 Md. 150 [132 Am. St. Rep. 420, 72 Atl. 669].)

The foregoing cases illustrate the principle that where there is an ambiguity of expression by the testator as to the identity of the objects of his bounty, his real intent and

meaning will be sought for in the light of the law pertaining to such objects under the law in force and existing at the time the testator formed and expressed his intent.

On behalf of the respondents, however, it is argued in substance that there is no ambiguity existing in the will as regards the identity of the beneficiaries of the contingent remainder because the law has given a fixed and stable meaning to the words "my heirs" used by the testator. Therefore, respondents "earnestly contend that those entitled to share in the distribution of the estate are those who can qualify as heirs of decedent under the law which was in force at the time of the death of the life tenant. It is true that testatrix is presumed to have known the law at the time of the execution of the will. The law was, and she knew it, that the legislature had exclusive control over the laws of succession and could amend or repeal such laws at any time; that the legislature met every two years. She is also presumed to have known that the law was amended in 1905. She knew that her will did not take effect until her death, and that as to the contingent remainder provided by the will, the shares therein given to a class did not vest in them until the termination of the life estate." In support of their contention respondent relied upon the following authorities: *Lincoln* v. *Perry,* 149 Mass. 368 [4 L. R. A. 217, 21 N. E. 671]; *Van Tilburgh* v. *Hollinshead,* 14 N. J. Eq. 32; *Kohler's Estate,* 199 Pa. St. 455 [49 Atl. 286]; *McGunnigle* v. *McKee,* 77 Pa. St. 81 [18 Am. Rep. 428]; *Gilliam* v. *Guaranty Trust Co.,* 186 N. Y. 127 [116 Am. St. Rep. 536, 78 N. E. 697]; *Butterfield* v. *Sawyer,* 187 Ill. 598 [79 Am. St. Rep. 246, 52 L. R. A. 75, 50 N. E. 602]; *Smith* v. *Hunter,* 86 Ohio St. 106 [99 N. E. 91].

These were cases where the testator provided simply and directly that the remainder in question should vest in the heirs at law or in the children of a *specified life tenant.* And the courts held that there being no ambiguity in designating the remaindermen and the estate in remainder not vesting until the death of the life tenant that therefore, if there were any changes in the statutes either of adoption or succession after the making of the will and before the vesting of the estate in remainder, those statutes should be effective in determining the persons who should share in the estate in remainder. But in the case at bar it will be

noticed that, though the life tenant was clearly designated, there was no attempt, as in the cases cited, to confine the remainder to the heirs of the said life tenant by the use of the word "heirs" as a technical word; in fact, in the case at bar, the first remainder attempted to be created was in favor of "his then living children." And in the case at bar the construction of the words "to his then living children" is not involved, as it was involved in some of the cases relied upon by counsel wherein was involved the question as to whether the word "children" would include illegitimate children or children by adoption and whether statutes of adoption or of legitimization enacted since the making of the will could be considered. And, furthermore, in the case at bar, unlike in the cases relied upon by counsel, the word "heirs" was not used in a technical sense by the testator; and, furthermore, the word "heirs" was qualified by the clause "as provided by the laws of the state of California, the same as if I had died intestate." In other words, in the case at bar the language of the will as used by the testatrix involves and invites a wider scope of interpretation than did the language used in the cases cited by counsel involving the wills therein construed. Consequently in the case at bar the construction on the question of time involved cannot be settled by determining first that the contingent remainder did not vest until the death of the life tenant and then by suggesting that the testator knew that the legislature could amend or repeal the law in the light of which she made her will, and that she knew that the legislature met every two years and is presumed to have known that the law was amended in 1905, and knew that her will did not take effect until her death, and knew that as to the contingent remainder the shares therein given to a class did not vest in them until the termination of the life estate.

In the first place, as to the use of the words "my heirs," on the previous appeal referred to (*In re Wilson's Estate*, 184 Cal. 63 [193 Pac. 581]) our supreme court stated: "Obviously this language referred simply to the manner of distribution among the persons constituting 'my heirs' among whom the property was to be distributed." Also, "The case is one where 'the context clearly indicates' (Civ. Code, sec. 1327) that the word 'heirs' was not used in the

strict technical sense as designating the person or persons who would have succeeded under our succession statutes to the estate of deceased had she died intestate.'' And, furthermore, as stated by counsel for respondents in their brief on this appeal ''of course, neither appellants nor respondents are strictly heirs at law of the testatrix. They take shares in her estate under a suppositional condition of affairs surmised by testatrix as possible of occurrence, and which actually came about. They take shares in the estate by analogy to the statute of successions and distributions, and under the supposition made by testatrix that they would have been her heirs at law if she had survived all her issue and had died subsequent to the date of the termination of the life estate.''

From all this it is evident that this will which does not use the word ''heirs'' in a technical sense, as it was used in the cases relied upon by counsel, and where it further appears that the whole clause ''upon his death all such real property shall be distributed among my heirs as provided by the laws of the state of California, the same as if I had died intestate'' was indicative ''simply of a suppositional condition of affairs surmised by testatrix as possible of occurrence,'' it would seem that we should, in order to obtain a fair construction of testatrix's intent, place ourselves so far as we can in her actual situation as regards knowledge, motive, and surrounding conditions at the time she indulged in these suppositions.

In the first place, we must assume that the words ''as provided by law of the state of California, the same as if I had died intestate'' were inserted after the words ''my heirs'' for the purpose of adding to or qualifying the meaning already expressed by the words ''my heirs.'' And this is a fair presumption irrespective of the fact that the will was drawn by an attorney of high standing. At least one of the effects of the clause added would be to control the disposition of her personal property in the event of a change of domicile by applying thereto the laws of the state of California. It seems also equally clear that the laws she intended to refer to and apply were the laws existing at the time she made the will, ''the same as if I had died intestate.'' For since these words, as suggested by counsel, were used in an entirely suppositional sense then the only

time she could reasonably be *supposed* to have died intestate would have been some time immediately before the time she made her testament or will. And it was evident, in view of her approval of the laws as they existed at that time, conforming as they did to her natural instincts and actual feelings toward her own blood, that she meant to have the objects of her bounty designated by the laws as they then provided.

Counsel also cite the cases of *In re Nichols' Estate*, 102 Wash. 303 [L. R. A. 1918E, 986, 172 Pac. 1146], and *Will of Kopmeier*, 113 Wis. 233 [89 N. W. 134], wherein it is stated that "a will is ambulatory during the life of its maker and subject to his control." In each of these cases, unlike the case at bar, it was not the mere intention of the testator that was involved but the validity and effect of the will as to whether or not it was contrary to public policy. So it was properly held in each of those cases that the law or the condition existing at the time of the taking effect of the will would control the situation as to whether the effect of the will was in accord with the law. The intent or purpose that the testator might entertain as to the identity of the objects of his bounty was not in those cases a subject of construction or interpretation. The invalidity of the will would be determined by the status of the law and fact at the time the will became effective at the death of the decedent. (*Barber* v. *Brown*, 55 Okl. 34 [154 Pac. 1156] ; *Carter* v. *Whitcomb*, 74 N. H. 482 [17 L. R. A. (N. S.) 733, 69 Atl. 779] ; 2 Schouler on Wills, par. 840.)

Counsel also refers to the case of *Hardy* v. *Gage*, 66 N. H. 552 [22 Atl. 557], wherein he claims "the facts of the case are almost identical with the facts at bar." In that case the facts do differ from the facts in the other cases cited by counsel and are similar to the facts in the case at bar to the extent that both wills provide for a contingent remainder which does not directly and specifically vest in the heirs or children of the life tenant, but does go to the "heirs at law of the testator"; but the case cited does materially differ from the case at bar in that in the case at bar the testatrix specifically and further prescribes that "my heirs" shall be those "as provided by the laws of the state of California the same as if I had died intestate." And, as already noted, these words under a proper construction should

be given some meaning for the purpose of explaining and qualifying the words immediately preceding them. They should not be so construed as to insert "as may be" or "as shall be" or "as to be" or "as then provided" when the testatrix herself did not make use of or evidently intend to make use of any such further qualifying words; but did evidently use the words "as provided" to express a present and existing situation and status of the law with which she was content "the same as if she had died intestate." Also, counsel refers to section 1336 of the Civil Code, which provides that "words in a will referring to death or survivorship simply" relate to the time of the testator's death, etc. But in the case at bar the words in the will do not refer "to death or survivorship *simply*." (*Estate of Briggs,* 186 Cal. 351, at page 356 [199 Pac. 322].) In the case at bar the immediate words which are the subject of construction are not the words which are determinative of the *vesting* of the estate but are the words determinative of the intent of the testatrix in regard to whether she desired to have the objects of her contingent bounty determined by the law existing at the time she expressed her intent and made the will or by any law that might be in effect at the time of the vesting of the estate. And since "judicial construction is the process of applying natural methods of finding and weighing evidence to discover the fact of intention" (*Peet* v. *Peet,* 229 Ill. 341 [11 Ann. Cas. 492, 13 L. R. A. (N. S.) 780, 82 N. E. 376]), it would seem that such intention in the case at bar should not be determined by assuming a knowledge on the part of the testator of technical words pertaining to the time of the vesting of an estate in heirs when, as has been held, she did not use the word "heirs" in any technical sense and when she used no apt words to indicate that it was her intent to be so governed. Such a construction as is contended for by respondents herein is not responsive to the spirit of the rule which makes the existing lawful intent of the testator as expressed by our supreme court the polar star of construction,

> "Of whose true, fixed and resting quality
> There is no fellow in the firmament;
> The skies are painted with unnumbered sparks,
> They are all fire and every one doth shine;
> But there's but one in all doth hold his place."

In the language of Wigmore in his monumental work on Evidence, second edition, volume 5, paragraph 2461: "The history of the law of interpretation is a history of progress from a stiff and superstitious formalism to a flexible rationalism," and paragraph 2462, "So long as men are allowed to grant and contract freely, and so long as the law undertakes to carry out those acts by enforcement, just so long must the standard of interpretation continue to be mobile, subjective and individual."

The construction of the will contended for by the appellants will therefore be accepted as being more in accord both with the language of the will as well as being in more accord with the intent of the testatrix interpreted in the light of all the surrounding circumstances.

It is therefore ordered that the judgment be reversed and the lower court be directed to make distribution of the property of the estate to appellants.

Finch, P. J., and Plummer, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 21, 1924.

All the Justices concurred.